Richard H. CROOK and Virginia R. Thomas Zerbe, Executors of the Will of Bertha E. Thomas, Deceased, Plaintiffs,

v.

The UNITED STATES of America, Defendant.

Richard H. CROOK and Virginia R. Thomas Zerbe, Executors of the Will of Bertha E. Thomas, Deceased, Plaintiffs,

v.

Stanley GRANGER, Collector of Internal Revenue for the 23rd District of Pennsylvania, Defendant.

Civ. A. Nos. 9506, 9507.

United States District Court
W. D. Pennsylvania.

Oct. 11, 1955.

Bialas & Ryan, Pittsburgh, Pa., John F. Thaete, Walter B. Gibbons, Philadelphia, Pa., for plaintiffs.

D. Malcolm Anderson, Jr., U. S. Atty., Pittsburgh, Homer R. Miller, Spec. Asst. to Atty. Gen., for defendants.

JOHN L. MILLER, District Judge.

The above entitled cases, involving common questions of law and fact, were tried by this court without a jury.

Civil action No. 9506 is an action instituted by plaintiffs as executors of the will of Bertha E. Thomas, deceased, against the United States to recover income taxes for the calendar year 1940 in the amount of $6,285.95, plus interest. Civil action No. 9507 is an action by the same plaintiffs as executors of the will of Bertha E. Thomas, deceased, to recover $229,809.31, plus interest, income taxes for the years 1942, 1943, 1944, 1945, and 1946.

The main question presented is the same in both cases, i. e., as stated by defendants, whether certain sums received by decedent in her lifetime in the year 1940 and during the years 1942 to 1946, inclusive, which were paid to her by Thomas Flexible Coupling Company, are taxable as ordinary income under Int.Rev.Code of 1939, § 22(a), 53 Stat. 9, 26 U.S.C. § 22(a), or whether such sums are taxable as long-term capital gains under § 117(a) (4), 53 Stat. 50, 26 U.S.C. § 117(a) (4).

Other questions presented are as follows:

(a) Whether the alleged claim for refund filed by decedent for the year 1940 was adequate to constitute a legal claim for refund sufficient to support plaintiffs' cause of action no. 9506.

(b) A special question of allocation has been raised with respect to payments received by Mrs. Thomas in 1943.

(c) Whether plaintiffs have established by a fair preponderance of the evidence that all of the proceeds received by the decedent may be attributed to the transfer of the oldest of the patents on flexible couplings here involved, rather than to a later patent which the evidence discloses was held for a period of less than six months on the date of its transfer to Thomas Flexible Coupling Company by decedent.

Findings of Fact

1. Bertha E. Thomas, the decedent, died April 24, 1947, a resident of Warren County, Pennsylvania, leaving a will which was duly admitted to probate by the Register of Wills of Warren County and letters testamentary were issued to plaintiffs.

2. For the calendar year of 1940 Bertha E. Thomas filed an income tax return reporting an income tax of $8,-227.96, which she paid to William Driscoll, then Collector of Internal Revenue, 23d District of Pennsylvania, on March 3, 1941. Driscoll retired from office June 16, 1941, and has not been in office as Collector for said district since the date of his retirement.

3. On February 23, 1941, decedent filed a claim for refund for income taxes paid for the year 1940 in the amount of $8,227.96, plus interest. In said claim decedent set forth the following:

"Taxpayer included in her 1940 taxable income receipt of $37,151.-04 representing royalties on patents and so treated on her return in determining her tax liability for the year. A petition is now pending before the Board of Tax Appeals wherein there is a possibility that it may be held that the aforementioned payment of $37,151.04 should be treated as a capital expenditure instead of as payment of royalties on patents. This claim is therefore filed in order to preserve the taxpayer's right to a refund if it is finally determined that this payment was not royalties on patents as it has been treated on her return and that it should be treated as a capital receipt by the Taxpayer thereby resulting in a lower income tax liability for the said year. Until the nature of the payment has been definitely

determined it is impracticable to attempt to compute a revised tax liability."[1]

4. The Commissioner of Internal Revenue did not act upon the claim for refund for 1940 prior to the institution of civil action No. 9506, and more than six months elapsed between the filing of the claim for refund and the institution of said suit. The timeliness of the claim is not in dispute.

5. During her lifetime decedent filed income tax returns for the calendar years 1942, 1943, 1944, 1945, and 1946 and reported and paid income taxes as follows:

| Year | Amount |
|---|---|
| 1943 | $264,173.46 |
| (proper adjustments being made for 1942 tax) | |
| 1944 | 54,563.46 |
| 1945 | 3,338.63 |
| 1946 | 12,802.86 |
| | $334,878.41 |

The timeliness of payment of these taxes is not in dispute. The dates of payment are as disclosed by allegations in the complaint, admissions in the answers, and stipulations of counsel.

6. During her lifetime decedent filed concededly sufficient and timely claims for refund for the years 1942 to 1946, inclusive, based on the grounds that decedent erroneously reported in her returns for 1942 to 1946, inclusive, as ordinary income the following sums:

| Year | Amount |
|---|---|
| 1942 | $170,833.16 |
| 1943 | 276,323.73 |
| 1944 | 80,000.00 |
| 1945 | 17,978.35 |
| 1946 | 33,089.04 |

Decedent alleged in said claims for refund that said sums were erroneously reported as ordinary income, whereas they should have been treated as capital gains for the reason that they were paid by Thomas Flexible to decedent on the sale or exchange of certain patent rights owned by decedent, and that said sums represent capital gains under Int. Rev.Code, § 117.

7. On February 13, 1951, the Commissioner of Internal Revenue notified plaintiffs of the disallowance of the

---

1. At the time of filing this claim there was pending before the United States Tax Court the case of Thomas Flexible Coupling Co. v. Comm'r, which involved the question of whether Thomas Flexible for the years 1939, 1940, and 1941 was entitled to deduct as ordinary and necessary business expenses under Int.Rev. Code of 1939 § 23(a), 53 Stat. 12, 26 U.S. C. § 23(a), certain amounts paid decedent by Thomas Flexible under a 1939 contract, set forth in ¶ 10, *infra*, transferring certain patent rights. It was held that Thomas Flexible was under no legal obligation to pay these royalties because of a contract entered into in 1920 under which decedent was bound to transfer certain patents without further payments and that the payments were voluntary and not deductible. 1944 T.C.Mem.Dec. ¶ 44,190 (May 31, 1944), affirmed 3 Cir., 1946, 158 F.2d 828, certiorari denied 1947, 329 U.S. 810, 67 S.Ct. 624, 91 L.Ed. 691.

After the foregoing Tax Court decision, but before its affirmance by the Third Circuit, decedent secured a declaratory judgment against Thomas Flexi-

ble in the Court of Common Pleas of Warren County, which judgment was affirmed by the Pennsylvania Supreme Court. Thomas v. Thomas Flexible Coupling Co., 1946, 353 Pa. 591, 46 A.2d 212. The Pennsylvania Supreme Court held that both the 1939 and 1943 contracts were supported by consideration and were binding on the ground, *inter alia*, that the 1920 agreement had expired in 1937.

Thereafter, in Commissioner of Internal Revenue v. Thomas Flexible Coupling Co., 3 Cir., 1952, 198 F.2d 350, affirming 1950, 14 T.C. 802, the payments here involved for the years 1942, 1943, and 1944 were held to be deductible by Thomas Flexible as ordinary and necessary business expenses to the extent of $80,000 per year.

Plaintiffs herein were not parties to the foregoing tax litigation, and plaintiffs' chief contention here, that the payments constituted the sales price of a capital asset, does not appear to have been raised and considered therein.

claims for refund for 1944 and 1946. The Commissioner has taken no action on the claims for refund for 1942, 1943, and 1945. However, more than six months elapsed between the filing of said claims and the institution of civil action no. 9507.

8. On September 2, 1937, the decedent made application to the United States Patent Office for letters patent, hereinafter called the first patent, under patent application No. 162205, on which letters patent No. 2182711 were issued on December 5, 1939, on certain flexible couplings.

9. On August 8, 1939, decedent made an application to the United States Patent Office under patent application No. 289058 on which letters patent No. 2251722, hereinafter called the second patent, were issued on August 5, 1941.

10. On November 26, 1939, decedent and Thomas Flexible entered into a written contract, hereinafter called the 1939 contract, with respect to the transfer of the above-mentioned patent rights. This contract provided:

"THIS AGREEMENT made and entered into this *26* day of *November* 1939, by and between the Thomas Flexible Coupling Company, a corporation existing under and by virtue of the laws of the State of Pennsylvania, having its principal place of business at 1200 Main Avenue, Warren, Pennsylvania, hereinafter referred to as 'Company' and Bertha E. Thomas of No. 9 Second Avenue, Warren, Pennsylvania, thereinafter referred to as 'Inventor'.

"WITNESSETH, THAT:

"WHEREAS, 'Inventor' has conceived of and produced inventions relating to flexible couplings, as more particularly set forth in applications filed in the United States Patent Office and identified as Follows:—

Flexible Couplings
Serial No. 162,205
Filed September 2, 1937
Allowed October 10, 1939
Emergency Supports for Flexible Couplings
Serial No. 289,058
Filed August 8, 1939

"WHEREAS, 'Inventor' has, or may have, other new and useful improvements and ideas relating to flexible couplings.

"WHEREAS, 'Company is desirous of securing assignment of the inventions and proprietary rights of 'Inventor' in and to the above identified applications for United States patents, and in and to the inventions set forth therein, and to any inventions relating to flexible couplings which the 'Inventor' may hereafter make.

"NOW, THEREFORE, for and in consideration of the sum of Three Thousand Five Hundred Dollars ($3500.00) paid by 'Company' to 'Inventor', receipt whereof is hereby acknowledged by 'Inventor' and other good and valuable considerations hereinafter mentioned, it is mutually understood and agreed as follows:—

"Article 1. 'Inventor' agrees at 'Company's' request, to execute in 'Company's' favor, all papers which may be necessary for the transfer, by complete assignment, of all of 'Inventor's' proprietary rights in and to the above identified applications for letters patent in the United States, and of all proprietary rights in and to any inventions which 'Inventor' may now have or make in the future relating to flexible couplings; on the terms and under the conditions as hereinafter provided.

"Article 2. 'Inventor' agrees at 'Company's' request, to make and execute and have filed in the United States Patent Office, and in the re-

spective offices of foreign countries, applications for patents on such of 'Inventor's' inventions relating to flexible couplings, as may be deemed advisable by 'Company'.

"Article 3. 'Company' agrees to keep a true and accurate record of the exact number of flexible couplings and discs manufactured and sold by it; together with the invoicing price of all such couplings and discs as are sold, and to render to 'Inventor' monthly reports (under oath if requested by 'Inventor') setting forth the number of flexible couplings and discs sold by it embodying any of 'Inventor's' inventions. 'Company' hereby agrees to permit 'Inventor', or her duly authorized and accredited representative, to examine its records at all reasonable times to verify such reports.

"Article 4. 'Company' shall pay to 'Inventor' a royalty in amount of 6% of the invoicing price of all complete couplings sold by 'Company', or by any of 'Company's' licensees; said royalty to be payable monthly in conformity to the reports set forth in the immediately preceding article.

"Article 5. 'Company' shall pay to 'Inventor' a royalty in amount of 20% of the invoicing price of all coupling discs based on the repair price list of discs ordered as repair parts, whether such discs are manufactured by 'Company', or 'Company's' licensees.

"Article 6. 'Company' shall pay to 'Inventor' a royalty in amount of 33⅓% of the invoicing price of all coupling discs sold separately, where the customer makes the other parts of the coupling, whether such discs are manufactured by 'Company', or 'Company's' licensees.

"Article 7. The minimum royalty to be payable monthly in conformity with the immediately preceding Articles 4, 5, and 6 shall not be less than Two Hundred Fifty Dollars ($250.00) and in default thereof the 'Inventor' may at her election cancel this agreement.

"Article 8. This agreement shall become effective as of the eighth day of May, 1939, which is the first date on which the United States patent Examiner held that the claims covering discs in application Serial No. 162,205 appeared to be allowable, and shall continue in full force and effect until the expiration of any United States patent which may issue on the aforesaid application Serial No. 162,205.

"Article 9. 'Inventor' agrees to promptly disclose to 'Company' any and all inventions made or acquired by 'Inventor' during the life of this agreement with respect to flexible couplings, and agrees to make a prompt and complete assignment to 'Company' of her entire title, right and interest in and to any inventions or patentable improvements which she may make or acquire in the future with respect to flexible couplings. Provided however, that 'Inventor' will be adequately compensated for any such inventions which 'Company' may at its discretion acquire from 'Inventor'.

"Article 10. 'Inventor' agrees to assign to 'Company' her entire title, right and interest in and to any pending applications, patents, or applications which may be filed in the future and in and to any inventions therein set forth which relate in any way to flexible couplings.

"Article 11. 'Inventor' agrees that 'Company' shall have the complete control and regulation as to filing and prosecution of application for patents in the United States and foreign countries, upon any of 'Inventor's' present or future inventions relating to flexible couplings.

"Article 12. 'Company' agrees to assume all financial expenditures

necessary to prepare and prosecute 'Inventor's' patent applications as herein outlined, and agrees to bear all expenses incidental to the upkeep of patent applications and patents issued thereon, such as payment of Government taxes, fees, maintenance and normal working expenses.

"Article 13. It is understood that 'Company' shall have exclusive control of the prosecution of suits against infringers and shall be entitled to retain all proceeds as a result of such suits, subject to payment of royalties in proportion to the royalties herein outlined.

"IN WITNESS WHEREOF, the parties hereto have, on the date first above written, caused these presents to be signed by 'Inventor' personally, and by 'Company' in its corporate name by its duly authorized officer and its corporate seal affixed hereunto."

11. The first patent was a patent on the complete flexible coupling. This patent was concededly held by decedent for more than 18 months prior to its transfer to Thomas Flexible under the 1939 contract. The second patent was a patent upon certain emergency supports for said couplings. The evidence fails to establish that decedent had reduced this patent to practical use six months prior to its transfer to Thomas Flexible.

12. On November 26, 1943, decedent and Thomas Flexible entered into another agreement, hereinafter called the 1943 contract, which provided:

"THIS SUPPLEMENTAL AGREEMENT made and entered into this 26th day of November 1943 but effective as of July 1st, 1943 by and between Thomas Flexible Coupling Company, a corporation existing under and by virtue of the laws of the State of Pennsylvania, having its principal place of business at 1200 Main Avenue, Warren, Pennsylvania hereinafter as referred to as 'Company' and Bertha E. Thomas of No. 9 Second Avenue, Warren, Pennsylvania, hereinafter referred to as 'Inventor'.

"WITNESSETH, THAT:

"WHEREAS, there is now in force between the parties hereto a patent agreement covering certain patents of 'Inventor' which have been assigned to the 'Company' under an agreement dated the 26th day of November 1939, which agreement provides for the payment of royalties by the 'Company' to said 'Inventor'; and

"WHEREAS, the total royalties computed under the said agreement are now in excess of the amount contemplated by the parties when the said agreement was executed, and

"WHEREAS, the stockholders of the corporation at a meeting held November 11th, 1943 authorized a revision of the said agreement to more clearly carry out the intentions of the parties at the time the said agreement was made, and

"WHEREAS, 'Inventor' has made certain improvements in flexible couplings for which she has made application for letters patent of the United States, Serial No. 478,267 filed March 6, 1943, and the ownership of which application is now fully vested in 'Inventor',

"NOW, THEREFORE, for and in consideration of Ten Dollars ($10.-00) paid by 'Company' to 'Inventor', receipt whereof is hereby acknowledged by 'Inventor', and other good and valuable considerations hereinafter mentioned, it is mutually understood and agreed as follows:

"1. 'Company' agrees as of the date of this supplemental agreement to sell, assign and transfer to 'Inventor' all of its entire title, right and interest in and to letters patent of the United States number 2,182,-711 patented December 5, 1939, and number 2,251,722 patented August 5,

1941, respectively identified in the aforesaid agreement of November 28, 1939, as:—

Flexible Couplings
Serial No. 162,205
Filed September 2, 1937
Allowed October 10, 1939

Emergency Supports for Flexible Couplings
Serial No. 289,058
Filed August 8, 1939
Allowed March 17, 1941

and subsequently assigned by 'Inventor' to 'Company' thru assignment dated October 26, 1939 and recorded in the United States Patent Office October 27, 1939, Liber G181-pg. 503.

"2. Concurrent with the assignment set forth in Section 1 above 'Inventor' agrees to grant to 'Company' an exclusive, non-assignable, non-transferable personal license to make, use and/or sell flexible couplings and/or parts thereof under the aforesaid United States patents 2,182,711 and 2,251,722 and under the above identified pending application Serial No. 478,267, filed March 6, 1943, for the life of said patents and any patent, or patents issued therefrom.

"3. In lieu of the royalty provisions set forth in Articles 4, 5 and 6 of the said agreement of November 26, 1939, the 'Company' hereby agrees retroactively effective as of July 1, 1943 to pay to the 'Inventor' a royalty of 6% of the invoice price of all couplings and parts thereof manufactured and/or sold by it.

"4. It is agreed between the parties that the minimum royalty provision as set forth in Article 7 of the agreement of November 26, 1939 shall remain in full force and effect.

"5. The maximum royalties payable by 'Company' to 'Inventor' under this supplemental agreement in any one calendar year shall not exceed $80,000.00. Inasmuch as this supplemental agreement is effective as of July 1st, 1943, the total royalties payable for the period from July 1st, 1943 to December 31st, 1943 shall not exceed $40,000.00. Royalties for the period January 1, 1943 to June 30, 1943 shall be computed under the agreement of November 26, 1939.

"6. The parties agree that the provisions of Articles 9 and 10 of the agreement of November 26, 1939 are hereby cancelled and in lieu thereof the 'Inventor' agrees to promptly disclose to 'Company' any and all inventions made or acquired by 'Inventor' during the life of this agreement, with respect to flexible couplings and pursuant to the terms of this agreement agrees to grant the 'Company' an exclusive, non-transferable, non-assignable personal license to 'Company' to make, use and/or sell any of such inventions to the 'Company', provided, however, that the 'Inventor' will be adequately compensated for any such license which 'Company' may, at its discretion, acquire.

"7. 'Company' agrees to keep a true and accurate record of all sales of flexible couplings and parts thereof involving any of the inventions of the above identified patents or pending application and to render to the 'Inventor' monthly reports under oath, if requested by 'Inventor'. 'Company' hereby agrees to permit 'Inventor' or her duly authorized representatives, to examine these records at all reasonable times to verify such reports.

"8. In the event that the 'Company' fails to make the minimum payment of royalties or the payment of any royalties as herein provided to the 'Inventor' for any three months' period the 'Inventor' may by notice in writing sent by registered mail to the 'Company' at its principal place of business cancel this agreement, said cancellation to take effect 30 days after receipt of said notice. At

the expiration of the aforesaid 30 day period, the 'Company' shall be divested of all interest in and to all foregoing patents and pending application herein set forth, and any and all rights under the agreement of November 26, 1939 and this agreement, and 'Inventor' shall be free to license other individuals and companies upon such terms and conditions as she may deem fit and proper.

"9. Except as hereinbefore changed or modified the said contract of November 26, 1939 shall remain in full force and effect."

13. As stipulated by counsel, during the years 1940 to 1946, inclusive, decedent was not in the business of inventing and was not a dealer in patents, but was during all of said period a housewife.

14. During the years 1940 to 1946, inclusive, decedent and her husband, Millard Thomas, were the owners of a majority of stock in Thomas Flexible, and decedent's husband was the president and was in active charge of the operations of said company.

15. Pursuant to said agreements, Thomas Flexible paid to decedent the following sums in the following years:

| Year | Amount |
|------|--------|
| 1940 | $ 37,151.04 |
| 1942 | 170,833.73 |
| 1943 | 276,323.73 |
| 1944 | 80,000.00 |
| 1945 | .17,978.35 |
| 1946 | 33,089.04 |

16. The second patent, the so-called emergency support patent, was included in some couplings which were manufactured and sold under the first patent. In some instances, articles under the emergency support patents were manufactured and sold separately, in most cases directly or indirectly to the Navy. However, no payments were added on account of any patent other than the first patent. Of the three patents here involved, the first and second patents and the third patent, rights in which were transferred to Thomas Flexible by decedent under the 1943 contract, the first patent was the basic patent and was involved in all the sales upon which payments to decedent were made. The second patent was an improvement upon the first patent. The third patent covered a method of manufacturing. Thomas Flexible, in making the payments here involved, considered such payments as being for and on account of the first patent.

17. All of the payments here involved by Thomas Flexible to decedent were made under the 1939 and 1943 contracts. Payments for the period ending June 30, 1943, were made pursuant to the 1939 contract; payments for the period beginning July 1, 1943, were made pursuant to the 1939 contract as supplemented by the 1943 contract.

18. The court finds all facts as stipulated by the parties and those alleged in the complaints insofar as they are admitted by the answers filed by defendants.

Discussion

1. Defendant contends that civil action No. 9506 should be dismissed because the claim for refund for 1940 was stated in terms of a contingency which has never occurred. The question of the sufficiency of the claim was first raised by the defendant's amended answer to the complaint, filed August 3, 1954.

The claim was filed pursuant to the provisions of Int.Rev.Code of 1939, § 322(b) (1), 53 Stat. 91, 26 U.S.C. § 322 (b) (1). U.S.Treas.Reg. 103, § 19.322–3, provides:

"The claim must set forth in detail each ground upon which a refund is claimed, and facts sufficient to apprise the Commissioner of the exact basis thereof."

Defendant's construction of the claim "smacks too much of the strangling niceties of common law pleading." Cf. Angelus Milling Co. v. Comm'r, 1945, 325 U.S. 293, 297, 65 S.Ct. 1162, 1164, 89 L.Ed. 1619. As stated in United States v. Kales, 1941, 314 U.S. 186, 196, 62 S.Ct. 214, 219, 86 L.Ed. 132, the "use of the future tense in stating a

claim may, with due regard to the circumstances of making it, rightly be taken as an assertion of a present right." The claim for refund for 1940, reasonably construed, should be taken as an assertion of a present right. The claim clearly sets forth "facts sufficient to enable the Commissioner of Internal Revenue to make an intelligent administrative review of the claim", Scovill Mfg. Co. v. Fitzpatrick, 2 Cir., 1954, 215 F.2d 567, 569, and the claim was never denied on the basis of its insufficiency prior to the institution of the present suit.

See also United States v. Memphis Cotton Oil Co., 1933, 288 U.S. 62, 71, 53 S.Ct. 278, 77 L.Ed. 619; Stuart v. United States, Ct.Cl.1955, 130 F.Supp. 386.

Therefore, defendant's contention with respect to the sufficiency of the 1940 claim must fail.

2. In civil action No. 9507, with respect to 1943, defendant contends that plaintiffs have failed to establish how much, if any, of the sum of $276,323.73 was paid during the first half of 1943. The uncontradicted testimony of Mr. Johnson, Secretary-Treasurer of Thomas Flexible, clearly indicates that the payments for the first half of 1943 were made in accordance with the 1939 contract, and the payments for the second half of 1943 were computed under the 1943 contract. Moreover, since, as indicated below, payments received under the 1939 and 1943 contracts are to receive the same tax treatment, it is immaterial how much of the sums received in 1943 were paid under the respective contracts.

3. With respect to the holding periods of the patents, defendants concede that the first patent was held long enough before its transfer for the proceeds of such transfer to receive capital gains treatment, and plaintiffs concede that the second patent was not held long enough before its transfer for the proceeds of such transfer to receive capital gains treatment. However, the parties are in dispute as to the allocation of the payments as between the first and second patents.

■ In view of the facts as stated above, the court is of the opinion that all of the payments here involved must fairly be attributed to the first patent. Accord, Kronner v. United States, 1953, 126 Ct.Cl. 156, 110 F.Supp. 730, 736.

4. Defendants do not dispute that the patents constituted capital assets in Mrs. Thomas' hands. The chief question in dispute between the parties is whether the 1939 and 1943 contracts effected a sale or a licensing of the patents. Both parties concede that this question is not determined by the use of such terms as "license", "sale", or "assignment" in the contracts. Defendants stress in support of their contention that Thomas Flexible was prohibited from assigning its rights in the patents, that the payments were to be computed on the basis of sales, and that Mrs. Thomas held an interest in Thomas Flexible and thus "retained a stake" in the patents.

■ It may be stated as a general rule that to constitute a sale or assignment of a patent, a transfer must be made of the rights to make, use, *and* to sell the subject matter of the patent. Waterman v. Mackenzie, 1891, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923. The Court held, 138 U.S. at pages 255–256, 11 S.Ct. at page 335:

"The patentee or his assigns may, by instrument in writing, assign, grant, and convey, either, 1st, the whole patent, comprising the exclusive right to make, use and vend the invention throughout the United States; or, 2d, an undivided part or share of that exclusive right; or, 3d, the exclusive right under the patent within and throughout a specified part of the United States. Rev.Stat. § 4898 [35 U.S.C. § 261]. A transfer of either of these three kinds of interests is an assignment, properly speaking, and vests in the assignee a title in so much of the patent itself, with a right to sue infringers. * * * Any assignment or transfer, short of one of these, is a mere license, giving the licensee no

title in the patent, and no right to sue at law in his own name for an infringement. * * *

"Whether a transfer of a particular right or interest under a patent is an assignment or a license does not depend upon the name by which it calls itself, but upon the legal effect of its provisions."

See also United States v. General Elec. Co., 1926, 272 U.S. 476, 489, 47 S.Ct. 192, 71 L.Ed. 362; Crown Die & Tool Co. v. Nye Tool & Mach. Works, 1923, 261 U.S. 24, 43 S.Ct. 254, 67 L.Ed. 516; cf. Lynne Gregg, 1952, 18 T.C. 291, 301–302, affirmed per curiam, 3 Cir., 1953, 203 F.2d 954; Parke, Davis & Co., 1934, 31 B.T.A. 427, Acq. XIV–1 Cum.Bull. 15 (1935).

■ In the instant cases the 1939 agreement appears clearly to convey the title to certain patents to Thomas Flexible, but in the 1943 contract, Thomas Flexible purports to reconvey them to Mrs. Thomas and to take a license back of the exclusive right to make, use and sell under the patents. However, under the doctrine of the Waterman case, such a "license" would suffice to effect a sale to Thomas Flexible. The denomination of the transaction as a licensing is immaterial. United States v. Carruthers, 9 Cir., 1955, 219 F.2d 21; Allen v. Werner, 5 Cir., 1951, 190 F.2d 840, 842; Kavanagh v. Evans, 6 Cir., 1951, 188 F.2d 234, 236; Green v. Le Clair, 7 Cir., 1928, 24 F.2d 74; Pike v. United States, D.C.D. Conn.1951, 101 F.Supp. 100, 101; Lamar v. Granger, D.C.W.D.Pa.1951, 99 F.Supp. 17, 36; General Spring Corp., 12 CCH TCM 847 (1953); Kronner v. United States, supra, 110 F.Supp. at page 734; Kimble Glass Co., 1947, 9 T.C. 183, 189; Edward C. Myers, 1946, 6 T.C. 258, Acq. 1946–1 Cum.Bull. 3, Non Acq.Mim. 6490, 1950–1 Cum.Bull. 9; Parke Davis & Co., supra; but see Eterpen Financiera Sociedad de Responsabilidad Limitada v. United States, 1952, 124 Ct.Cl. 20, 108 F.Supp. 100, certiorari denied 1953, 346 U.S. 813, 74 S.Ct. 22, 98 L.Ed. 340; Federal Laboratories, Inc., 1947, 8 T.C. 1150, 1156–57. The Pike case, supra, ·holds that a transfer of an exclusive license to make, use and sell constituted an assignment, for tax purposes, despite an explicit provision that the transaction should be construed as a licensing and not as an assignment. In the opinion of this court, the 1943 contract left the exclusive right to make, use and sell the subject matter of the patents where it was under the 1939 contract, in Thomas Flexible, and, therefore, the 1943 contract had no effect on the title to the patents for the purposes of the question here involved.

■ Defendants contend that the payments should not be construed as constituting the purchase price of something sold because they were not only paid in many installments, but were computed according to the sale or profits made by Thomas Flexible through the use of the patents. This contention was rejected by this court in Lamar v. Granger, supra, 99 F.Supp. at page 36, and the rejection was well supported by cases which had theretofore been decided. Rude v. Wescott, 1889, 130 U.S. 152, 162–163, 9 S.Ct. 463, 32 L.Ed. 888; Littlefield v. Perry, 1874, 21 Wall 205, 88 U.S. 205, 220, 22 L.Ed. 577; Commissioner of Internal Revenue v. Celanese Corp., 1944, 78 U.S.App.D.C. 292, 140 F.2d 339; Commissioner of Internal Revenue v. Hopkinson, 2 Cir., 1942, 126 F.2d 406, 410; Rotorite Corp. v. Commissioner of Internal Revenue, 7 Cir., 1941, 117 F.2d 245; Kimble Glass Co., supra, 9 T.C. at page 190; Edward C. Myers, supra.

Mim. 6490, withdrawing acquiescence in Myers insofar as Myers held that payments computed as a percentage of the price of patented articles sold could be treated as the sales price of a patent transferred under an "exclusive license", provided:

"6. It is held, under authority contained in section 3791(b) of the Internal Revenue Code [26 U.S. C. § 3791(b)], that this ruling shall not be applied with respect to royalties received from such exclusive license agreements for taxable

years beginning prior to June 1, 1950."

The taxable years here involved all predated June 1, 1950.

Defendants urge, in spite of the Commissioner's acquiescence in Myers, that because of two cases decided since Lamar v. Granger, supra, this court should overrule the Lamar case insofar as it held that an agreement for compensation based upon sales of a patented article is not inconsistent with a sale of the patent.

The two cases are Broderick v. Neale, 10 Cir., 1953, 201 F.2d 621, and Bloch v. United States, 2 Cir., 1952, 200 F.2d 63, certiorari denied 1953, 345 U.S. 935, 73 S.Ct. 796,.97 L.Ed. 1362. The Neale case is easily disposed of because it did not turn on any question of indeterminate royalties. Based squarely upon Waterman v. Mackenzie, supra, it held that an agreement in which the right to use the patented article was not transferred did not effect an assignment.

The Bloch case, supra, involved the problem presented by Int.Rev.Code of 1939, § 211(a), 53 Stat. 75, 26 U.S.C. § 211(a), imposing a tax on nonresident aliens, following the decision in Commissioner of Internal Revenue v. Wodehouse, 1949, 337 U.S. 369, 69 S.Ct. 1120, 93 L. Ed. 1419. Both cases held that there were taxable royalties, under their respective facts. The Wodehouse case involved a lump sum payment for less than all the rights in a copyright belonging to a nonresident alien.

In the Bloch case, also involving the taxation of nonresident aliens, the Second Circuit held that payments which varied "according to sales of the patented product, would .seem to be. essentially royalties." 200 F.2d at page 66. However, the court distinguished its earlier decision in Commissioner of Internal Revenue v. Hopkinson, supra, on the following basis:

"There the rights of a non-resident alien not doing business in the United States were not involved, or the statute defining such rights. We expressly so stated in Rohmer v.

Commissioner, 2 Cir., 153 F.2d 61, 64, note 16. Moreover, Judge Chase, who wrote the opinion in the Hopkinson case, concurred in the Rohmer decision. Furthermore, in General Aniline & Film Corp. v. Commissioner, 2 Cir., 139 F.2d 759, 760, a court consisting of L. Hand, Chase and Frank, Circuit Judges had stated that 'the passing of title does not preclude the existence of royalties.' "

Thus the Bloch case seems clearly insufficient to cause the Lamar case to be overruled in cases involving ordinary income versus capital gains taxation of American residents.

Moreover, indeterminate payments based upon sales have been held to constitute payments of purchase price of patents in cases decided after the Lamar case. United States v. Carruthers, supra; Allen v. Werner, supra; General Spring Corp., supra; Kronner v. United States, supra.

Defendants also contend that because, in the 1943 contract, Thomas Flexible was forbidden to sublicense or assign its rights, the transaction should not be construed as a sale of the patents. It is less than clear why a restraint on further alienation is inconsistent with the theory of a sale of the patents. The cases which are in point are contrary to defendants' contentions. Allen v. Werner, supra; General Spring Corp., supra; Parke, Davis & Co., supra.

The Government's objection to the provision against sublicensing seems to be based upon the theory that the transferee must get all the rights in the patent, and that none must be kept by the transferor, for the transfer to constitute a sale. The objection to Mrs. Thomas' part ownership of the Company, whereby she is alleged to have kept a stake in the patents, is predicated upon the same theory. It should be noted that the "license" here was "exclusive" as well as "nonassignable"; thus, neither party could assign the patent rights without the consent of the other.

Whatever may be the law, following Commissioner of Internal Revenue v. Wodehouse, supra, in the copyright field or with respect to the taxation of nonresident aliens, cases in several categories indicate that it is not necessary for all the rights in a patent to pass from one party to another to constitute the transaction between the parties a sale:

(a) Under the Waterman case it is clear that the rights in a patent may be limited geographically.

(b) According to United States v. Carruthers, supra, the patent rights may also be limited to a particular industry.

(c) Under the Waterman case and other cases, clearly a sale of an undivided share of the patent rights may be made, the remaining share being retained. Boesch v. Graff, 1890, 133 U.S. 697, 10 S.Ct. 378, 33 L.Ed. 787; Kavanagh v. Evans, supra, Lamar v. Granger, supra; Parke, Davis & Co., supra.

(d) A patent transaction may be a sale with a license back from vendee to vendor. Littlefield v. Perry, supra; Lamar v. Granger, supra, 99 F.Supp. at page 39.

(e) A patent transaction may be a sale although the vendor retains the right to terminate the arrangement, e. g., for failure to pay royalties. Boesch v. Graff, supra; Littlefield v. Perry, supra; Allen v. Werner, supra; Commissioner of Internal Revenue v. Celanese Corp., supra; Green v. Le Clair, supra; Lamar v. Granger, supra; General Spring Corp., supra; Kronner v. United States, supra; Pike v. United States, supra; Edward C. Myers, supra.

For the foregoing reasons, the court is of the opinion that plaintiffs are entitled to recover in these actions.

### Conclusions of Law

1. This court has jurisdiction over the parties and the subject matter of this action.

2. The claim for refund filed by the decedent for the year 1940 is an adequate and sufficient claim for refund, in compliance with the provisions of Int.Rev. Code of 1939, § 322(b) (1), and Treas. Reg. 103, § 19.322-3 (governing the year 1940).

3. The patents here involved constituted capital assets within the meaning of Int.Rev.Code of 1939, § 117.

4. The 1939 contract, as supplemented by the 1943 contract, effected a sale of all the patents here involved within the meaning of Int.Rev.Code of 1939, § 117.

5. All of the sums received by the decedent from Thomas Flexible were fairly attributable to patent 2182711, the first patent, which patent was held for at least eighteen months prior to its transfer by decedent to Thomas Flexible.

Entry of judgment will be suspended pending the filing of a stipulation by the parties showing the amount due the plaintiffs.